J-S15015-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.J. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1541 WDA 2018 |

Appeal from the Order Entered September 28, 2018
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-119-2018

BEFORE:   GANTMAN, P.J.E., SHOGAN, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.:                    **FILED APRIL 23, 2019**

C.J. ("Mother") appeals from the order entered on September 28, 2018, that involuntarily terminated her parental rights to her child, K.M.J., born in 2017 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  We affirm.

In its Findings of Fact Regarding Contested TPR ("Termination of Parental Rights") Hearing, entered on September 28, 2018, the trial court set forth its findings of fact in this appeal, which we adopt herein.  Additionally,

_____

[1] On September 28, 2018, the trial court involuntarily terminated the parental rights of Mother's brother, K.J., who is the person Mother eventually indicated is Child's father, and of any unknown father to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  Neither K.J. nor any other individual filed a brief in this appeal or a notice of appeal from the order terminating his parental rights.  **See** Trial Court Opinion, 12/10/18, at 2 n.4.

_____

*   Retired Senior Judge assigned to the Superior Court.

in its opinion, the trial court set forth the factual background and procedural history of this appeal as follows.

> [Child] was born on February [  ], 2017; he is one-year old. C.J. (hereinafter Mother) is the mother of [Child]. Paternity has not been established for K.M.J. At the time of the [c]hild's birth, Mother named [T.J.] as the [f]ather of the [c]hild. However, on October 17, 2017, genetic testing ruled him out as a possible father.
>
> In addition to [Child], Mother has three other biological [female] children to whom her parental rights were terminated. With respect to these children, the [c]ourt previously found that these children were the products of incest because genetic testing established that the [f]ather of these children was a first degree relative (maternal grandfather or biological brother) of Mother. The maternal grandfather was ruled out by genetic testing. The maternal uncle (K.J.) did not comply with the court's order to submit to genetic testing. Mother later acknowledged that her brother K.J. was the biological father of her three older children, but denied that he was the father of [Child].[1]
>
> [Child] was removed from Mother's care on February [ ], 2017. He was adjudicated dependent on March 7, 2017. He has remained in care since his removal.
>
> On June 5, 2018, [t]he Office of Children Youth and Family Services (CYF) [or ("the Agency")] filed a petition for involuntary termination of parental rights in the interest of [Child]. On June 20, 2018, after the TPR petition was filed, [M]other disclosed that her brother, K.J., was the biological father of [Child].[2]
>
> _____
>
> [1] [Child] and his siblings have genetic illnesses and anomalies related to being children of an incestuous relationship with a relative of the first degree.
>
> [2] As a result of Mother's late disclosure, CYF filed an Amended TPR Petition on July 11, 2018 naming K.J. as [Child's father] and seeking termination of his parental rights[.]

Trial Court Opinion, 12/10/18, at 1-2 (footnotes in original).

On September 26, 2018, the trial court held an evidentiary hearing on the amended TPR petition. The trial court announced its findings in open court on September 28, 2018. At the hearing, Attorney Jennifer L. McGarrity from KidsVoice represented Child as his legal interest counsel. Child did not have a separate guardian *ad litem* ("GAL"). [2] Attorney Lilian A. Akin represented CYF, and Attorney Jeffrey K. Eisenberg represented Mother. K.J. did not appear at the hearing to contest the termination of his parental rights, nor did any counsel represent him at the hearing.

_____

[2] In *In re Adoption of L.B.M.*, ___ Pa. ___, 161 A.3d 172 (2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires the appointment of counsel to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. In *In re T.S.*, ___ Pa. ___, 192 A.3d 1080 (2018) (filed August 22, 2018), the Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. The Court explained, "if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings." *Id.* at ___, 192 A.3d at 1092-1093. Here, attorney McGarrity served as Child's legal interests counsel, and stated that Child, who was only one year and seven months old at the time of the hearing, was essentially non-verbal, and unable to express a subjective, articulable preference for counsel to advance. N.T., 9/28/18, at 276. Attorney McGarrity stated that the termination of Mother's parental rights served both Child's legal and best interests. *Id.* at 277. Thus, we agree with Attorney McGarrity that the mandates of *L.B.M.* and *T.S.* were satisfied based on Child's pre-verbal age. N.T., 9/28/18, at 276.

CYF first presented the testimony of Beth Bliss, Psy.D., a licensed psychologist in private practice who does contract work with Allegheny Forensic Associates. N.T., 9/26/18, at 5. Dr. Bliss is court-appointed through Allegheny Forensic Associates, and testified as an expert in psychology. *Id.* at 6. Next, CYF presented the testimony of Jennifer Mattey, the CYF caseworker assigned to the family. *Id.* at 92-93. Mother presented the testimony of Monica Phillippone, who has served as Mother's parenting coach through Justice Works Youth Agency since June of 2018. *Id.* at 200-201. Mother then testified on her own behalf. *Id.* at 206. Finally, Child presented the testimony of Child's foster mother, B.L. ("Foster Mother"). *Id.* at 242.

At the conclusion of the testimony, each counsel made a closing argument. *Id.* at 270. As noted *supra*, Attorney McGarrity asserted that the termination of Mother's parental rights to Child, who was only one year and seven months old at the time of the hearing, served both Child's legal and his best interests. *Id.* at 277.

On September 28, 2018, the trial court entered the order that involuntarily terminated Mother's parental rights to Child pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). On October 25, 2018, Mother timely filed a notice of appeal, along with a concise statement

of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

On appeal, Mother raises two issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b)?

Mother's Brief, at 6.

In her first argument, Mother argues that the trial court abused its discretion and/or erred as a matter of law in concluding that there was sufficient evidence to support the termination of her parental rights under section 2511(a)(2), (5), and (8). Mother's Brief, at 13. Mother contends that there was insufficient and conflicting evidence to support a clear and convincing finding that she cannot care for Child. *Id.* Mother states that she was sufficiently complying with the goals for reunification set forth by the trial court. *Id.* Mother urges that she had completed some goals, was continuing to work on others, and was still progressing with positive changes to her life and ability to care for Child. *Id.* Mother contends that CYF's evidence was

---

[3] The trial court entered an opinion with is finding of fact from the termination hearing on September 28, 2018, the same day it entered the termination order. The trial court entered a second opinion on December 10, 2018, pursuant to Pa.R.A.P. 1925(a)(2)(ii).

based mostly on CYF's speculative concerns, as well as CYF's unwillingness to trust Mother, which are matters Mother cannot resolve for CYF. *Id.* Mother suggests that CYF is placing blame on her for her incestuous conception of Child, as opposed to recognizing Mother as a victim of trauma. *Id.* at 13-14.

In her second issue, Mother argues that the trial court abused its discretion and/or erred as a matter of law in concluding that the termination of her parental rights under section 2511(b) best serves Child's needs and welfare. *Id.* at 14. Mother asserts that the termination of her parental rights unnecessarily and permanently terminates the loving bond and relationship between Child and her. *Id.* Mother states that Child has a strong and beneficial bond with her and that there is love between them, and the only way to provide this benefit to Child is to restore her parental rights. *Id.* Mother argues that termination should be denied when a bond is shown to be beneficial. *Id.* Mother urges that Child's needs and welfare encompass more than just his bare necessities. *Id.* Mother contends that the trial court erroneously adopted CYF's position that the only type of relationship between a parent and a child that will be problematic if severed is a necessary bond, as opposed to a beneficial bond. *Id.* Mother complains that the trial court minimized the bond that Child has with her. *Id.* Mother asserts that CYF's position deprives Child of the benefits of her love and affection. *Id.*

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (*quoting* **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the current case, we affirm the trial court's decision to terminate Mother's parental rights to Child under Section 2511(a)(2) and (b), which provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the

control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, [511 Pa. 599, 605,] 515 A.2d 883, 891 (Pa. 1986) (*quoting **In re: William L.***, [477 Pa. 322, 345,] 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 616 Pa. at 326-327, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A

parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

In its findings of fact, the trial court stated the following.

1. [Child] is placed in the care of [B.L.] and [M.L.] through Every Child. Child's biological sisters reside in this home and have been adopted by the [L.'s]. He has remained in their care for twenty (20) months, or for his entire life. He is doing well in the home and the [L.'s] are able to meet all of his special needs.

2. Due to the close genetic relationship between [Child's] biological parents, he (as well as his siblings) have many special needs, including: tremors, hypertonia, speech and developmental delays, weak eyes, GERD, low weight and height, microcephaly, cleft palate, difficulty feeding and eating, etc. Consequently, [Child] has many medical appointments including: urology, neurology (Dr. Cummings), Genetics (Dr. Madden), E & T specialist (Dr. Cho), ARCH Clinic, endocrinology (Dr. Salahh), feeding clinic, orthopedic team, cleft and craniofacial clinic, ophthalmology (Dr. Philibad), Gastroenterology, Child Development Unit, and his pediatrician (Dr. Eichmann). In addition, [Child] receives services through Alliance for Infants Toddlers -- physical therapy, developmental therapy and a nutritionist.

3. At the time of [Child's] birth and until June of 2018, Mother denied that her brother, [K.J.,] was the [f]ather of [Child]. After genetic testing confirmed that [Child's] father was a first[-]degree relative of Mother, Mother acknowledged that her brother, [K.J.,] was in fact the father of [Child]. ***Mother reported that she engaged in a sexual; [sic] act with her brother due to her being upset about the termination of parental rights to her daughters. [Child] is Mother's fourth child through incest.***

4. OCYF established the following goals for Mother: maintain stable and safe housing; engage in parenting to learn to meeting [sic] the basic and special needs of her [c]hild; engage in therapy to address trauma and victimization and to gain insight into how her intimate relationship with her brother is harmful to her and

her child;; [sic] [and to] obtain and maintain sobriety (as she has used marijuana during pregnancy).

5. Mother has appropriate housing. [Child] has unsupervised visitation at Mother's home and there have been no concerns about the housing.

6. Mother has been cooperative with services. She is working with Maria Allen from the Duquesne Family Support Center and coached parenting with. [sic] Justice Works. Mother also has a family support partner through Allegheny Family Network.

7. Mother has unsupervised visitation with [Child] three times per week (including overnight visitation). During this visitation, Mother is expected to demonstrate that she can meet the basic needs of her child as well as his special needs. Mother is required to make and attend appointments for [Child].

8. Mother appears to be loving and nurturing towards [Child]. He appears to have a nice bond with his [m]other.

9. Mother has been able to demonstrate that she can meet the basic needs of her [c]hild. She makes and attends most medical appointments.

10. Mother seems to understand [Child's] basic needs and some of his special needs. The caseworker does have some concerns that Mother is not able to recognize medical issues that arise. [Child] returned from visitation with [M]other with a double ear infection and ruptured ear drum (March 15, 2018), diaper rash, ringworm, impetigo, and hard or bloody stool. Mother states that [Child] does not have these issues or signs of distress when he is in her care. With respect to the impetigo, Mother did tell the transported [sic] that [Child] had diaper rash. However the rash on his genitals was blistered and scabbed[,] and the rash ultimately spread to his mouth. Mother used Desitin and petroleum jelly to treat the impetigo.

11. At times, Mother struggles at appointments to report family history, ask questions and advocate for [Child's] needs.

12. Mother is engaged in trauma-based therapy with Gae Maffei through Holy Family Institute. Mother attends 90-minute therapy sessions two to four times per month. ***Mother did not disclose***

*to her therapist the fact that her brother is the father of [Child] or that the TPR petition had been filed.*

13. [The trial court finds] that Mother has done a good job of demonstrating that she can meet the basic needs of [Child]. However, [the trial court did] not find that Mother has demonstrated that she understands the impact of continuation of an incestuous relationship with her brother upon her children. Mother has not been honest with the [A]gency, the court, or her therapist about the relationship with her brother. On one occasion, while the caseworker, Ms. Mattey[,] was in Mother's home[,] an unknown male attempted to enter Mother's home. Mother blocked the caseworker from seeing who it was and did not permit the unknown male to have access into her home. Mother's explanation for this incident made no sense and[,] accordingly, [the trial court did] not find her explanation to be truthful. While, [sic] [the trial court could] not conclusively say that it was Mother's brother at the door, [the court could] not think of another reason that Mother would hide this person from the [c]aseworker, so [the court could not] not exclude this possibility.

14. Mother has had an active case with Allegheny County OCYF since July of 2015. During this time[,] she was expected to demonstrate that [she] should could engage in healthy relationships and that she understood that the relationship with her brother was harmful to herself and her children.

15. *After parental rights to her daughters were terminated, Mother engaged in [an] unprotected sexual relationship with her brother. She hid the fact that she was pregnant and failed to seek prenatal care. After [Child's] birth, she named someone else at [sic] the [c]hild's father and adamantly denied that her brother was the father of her son. It was only after genetic testing revealed that [Child's] father was a first-degree relative of Mother that she acknowledged that her brother, [sic] was in fact the father of her child (on June 20, 2018 <u>after</u> the TPR petition had been filed).*

Trial Court Findings of Fact Regarding Contested TPR Hearing, 9/28/18, at 3-

5 (emphasis in original).

- 12 -

With regard to the considerations under section 2511(a)(2), the trial court found as follows:

> **Based upon the evidence presented, I find that the circumstances that led to the removal, adjudication, of dependency and continued placement of [Child] continue to exist for the reasons set forth below.**
>
> 1. Throughout the life of the dependency case for [Child], Mother has been cooperative with the [A]gency and with providers.
>
> 2. Mother has made progress in her maintaining housing, sobriety, and demonstrating that she can meet [Child's] basic needs.
>
> 3. Mother has made progress with meeting [Child's] very special needs. She makes and attends most medical and therapeutic appointments for her son. However, [the trial court] share[s] the concerns of the caseworker, foster mother and Dr. Bliss as to whether she can meet all his special needs on a day[-]to[-]day basis without oversight from the court and the [A]gency.
>
> 4. Due to [Child's] complicated genetics, he has medical and therapeutic needs that require many medical appointments, medications, therapies and at times, surgeries. [Child] needs a parent who understands his needs and who can advocate for him[,] and who is able to effectively question doctors and other professionals. At this point, although Mother has made progress, [the court does] not find that she is able meet his special needs.
>
> 5. On the other hand the foster parents, the [L.'s], have been able to effectively meet the needs of [Child] and his siblings[,] who share his genetic history and have many special needs as a result. As Dr. Bliss pointed out, Mr. and Mrs. [L.] are an effective team, the point being that they are team. [The trial court finds] that Mother lacks the support needed to meet [Child's] needs if services close out.
>
> 6. Mother has three other children to whom her rights were terminated. The father of these three children is Mother's brother[, K.J.]. At the time of [Child's] birth, paternity was not established. The person that Mother named father, [sic] was ruled out through genetic testing. It was after genetic testing revealed that [Child's] father was a first-degree relative of Mother, [sic]

- 13 -

that Mother admitted that her brother, [K.J.,] was also the [f]ather of [Child]. ***This admission occurred fourteen months after the child entered care and after the filing of the petition for termination of parental rights.*** Mother was not truthful with the [A]gency or the court about [Child's] paternity. There are still concerns that Mother may have contact with her brother, which is not safe for Mother or [Child]. Accordingly, [the court has] serious doubts that she understands that the intimate relationship with her brother is harmful to herself or her child or that she will refrain from such a relationship in the future.

7. Mother has a concerning history of trauma as a victim of abuse at the hands of her father and her brother. No doubt, this history has impacted Mother's ability to make good decision[s] for herself and for her children. While [the trial court has] empathy for Mother as a victim, [the court also has] great concern for the welfare of [Child,] who has no choice in who his parents are.

8. While [the trial court] agreed that Mother may be and still is powerless to disengage from her family and remains in every sense a victim, she is also an adult who made a choice for the fourth time to have contact with her brother, engage in a sexual act and conceive a child, knowing the risks to the health of her child.

9. Of great concern to this court is the fact that Mother lied about the paternity of [Child] and that she has not disclosed this information to her therapist.

Trial Court Findings of Fact Regarding Contested TPR Hearing, 9/28/18, at 8-9.

Mother argues that the evidence showed that she can parent with the support in place, and has been parenting Child three days a week. ***See*** Mother's Brief, at 19. She asserts that the trial court based its decision on more speculative concerns, as opposed to actual evidence, that Mother cannot care for Child without support in place. ***Id.*** We disagree. The trial court fully and adequately set forth its basis for terminating Mother's parental rights

based on the evidence that showed that, although Mother has made progress in her parenting abilities and has been cooperative with the Agency, Mother cannot adequately parent Child with his special needs because she does not have supports of her own in place once Agency involvement would be concluded. The trial court's concerns that Mother has continued to make poor decisions and exercise poor judgment in continuing to have unprotected sexual intercourse with her brother, although she has been the victim of trauma, are problematic to her ability to parent Child. Thus, we affirm the trial court's termination of Mother's parental rights pursuant to section 2511(a)(2). *S.P.*, 47 A.3d at 826-27.

Next, we proceed to consider the sufficiency of the evidence to support the termination of Mother's parental rights pursuant to section 2511(b). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires

consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs

- 16 -

of the child, including "the love, comfort, security, and stability the child might have with the foster parent." ***In re G.M.S.***, 193 A.3d 395, 401 (Pa. Super. 2018) (citation omitted); ***see also In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests).

Regarding the needs and welfare analysis of section 2511(b), the trial court made the following findings of fact.

1. Over the life of this case (including [Child's] siblings) Mother has been evaluated by Dr. Beth Bliss several times. Specifically Dr. Bliss completed the evaluations: August 2016—interactional evaluation with Mother and her daughters and an individual evaluation of Mother; June 2017—individual evaluation with Mother and interactional evaluation with Mother, [Child] and her daughters; January 2018—interactional evaluation with Mother and [Child] and an individual evaluation with Mother; August 8, 2018 —interactional evaluation with [Child] and his foster parents; August 15, 2018—interactional evaluation with Mother and [Child] and an individual evaluation with Mother. (***See*** reports of Dr. Bliss contained within CYF Exhibit 1).

2. Most recently, Dr. Bliss has diagnosed mother with Post-Traumatic Stress Disorder, Dependent Personality Disorder, Borderline Intellectual Functioning, and Intellectual Disability, Mild (Provisional)[.]

3. Dr. Bliss testified that[,] over time, Mother has made improvement in her parenting skills and appears to be able to meet the basic needs of her child.

4. During the August 2018 interactional evaluation, Dr. Bliss found that Mother was mostly able to simultaneously attend to [Child] and answer the evaluator's questions. Mother attended to his basic needs, such as wiping his nose when it was running. She selected developmentally appropriate toys and fed him snacks during the appointment. Mother was warm and affectionate with [Child], and he smiled at her and jumped into her arms a couple

of times. He was clearly comfortable with her and attached to her.

5. Dr. Bliss stated that[,] during earlier evaluations, Mother repeatedly insisted that she did not have sex with the same man who is the father of her daughters, stating that she could not find him. During the August 2018 evaluation, Mother admitted that she engaged in consensual sex with her brother. She stated that she had some belief that he may be her brother after her first daughter was born. After that, she still maintained a relationship with him and conceived their other two daughters because there was still some doubt as to whether he was her brother or not. Mother told Dr. Bliss that she was feeling depressed about having lost her daughters, and she drank heavily with her cousin, his friend, and her brother. That night, she engaged in sex with the cousin's friend. However, two days later, she saw her brother again and had sex with him. Thus, she was uncertain who [sic] of the two men [Child's] father was until genetic testing confirmed [he] was her brother's child.

6. Mother was able to explain some of [Child's] special needs to Dr. Bliss. She told Dr. Bliss the following:

> Ms. Johnson stated that [Child] receives developmental therapy weekly, physical therapy every other week, and a nutritionist nurse twice per month. He visits with her from Monday to Thursday, including overnights, and Ms. Johnson is present for all of his services and appointments. She stated that he is diagnosed with hypertonia, which means he has tight muscles. She also stated that he has "deep reflexes" but was unable to describe this further except to state that it has "something to do with the coughing that he has." [Mother] stated that he is underweight but gaining, so the nutritionist suggested a high calorie diet for him, including whole milk mixed with half-and-half, plus putting butter on all of his foods. She said that he receives WIC [a special supplemental nutrition program for Women, Infants and Children,] but it goes to the foster parents, not her. Finally, [Mother] stated that she is receiving parenting coaching every Wednesday for two hours, and they have not voiced any concerns with her parenting.

7. With respect to the interaction between [Child] and his foster parents, Dr. Bliss observed that [Child] showed a secure attachment to his foster parents. Both foster parents were warm and affectionate with him, and the foster father often smiled at him.

8. In Dr. Bliss' opinion, the foster parents worked well as a team to be able to attend to [Child] while also answering the evaluator's questions, and they both appear knowledgeable about his special needs. Both [foster] parents promoted developmentally-appropriate skill acquisition[,] and were playful and energetic with him. [Child] appeared attached to his foster parents, seeking them out when he got near the stranger evaluator, smiling at them, and appearing happy and natural in his interactions with them.

9. In Dr. Bliss's opinion, Mother's insight and judgment are limited and prognosis is guarded. The fact that she jumped to having unprotected consensual sex with her brother as a means of coping with her emotions regarding losing custody of her daughters is worrisome at best. Mother was aware that [Father] was her brother, that her children have medical and developmental issues related to shared genetics, and that she lost custody of her children primarily because of her previous sexual relationships with her brother, yet she still used the poor judgment to engage in this relationship with him again. Although Mother has showed [sic] some progress with her willingness to admit to these problems and work with service providers, she is still a vulnerable person who has shown a pattern of returning to unhealthy family members despite their histories. Dr. Bliss continues to have significant concern that Mother is either still currently in contact with her family members or else is likely to be again in the future. Accordingly, Dr. Bliss recommends [a]doption by the [L.'s] to best meet the needs and welfare of [Child]. She does recommend that the foster parents and Mother work through mediation to discuss the possibility of an open adoption.

10. In Dr. Bliss's opinion, the safety of [Child] would be at risk if Mother continued to have a relationship with her brother.

Trial Court Opinion Findings of Fact Regarding Contested TPR Hearing, 9/28/18, at 5-7.

J-S15015-19

In accordance with its findings of fact relative to section 2511(b), the

trial court made the following conclusions.

**Based upon the evidence presented, I find that termination of parental rights of the parents to [Child] best serve[s] the needs and welfare of [Child] for the reasons set forth below.**

1. [K.J.,] has not had contact with [Child] and has not parented him. He is a Megan's Law sex offender. [Child] has no relationship with [K.J.].

2. Paternity has not legally been established. No one has claimed paternity to [Child].

3. There is no doubt that Mother loves her son. This is evident from the descriptions of all who have observed Mother engaging with [Child]. However, [the trial court found] that [Child] would not be safe in the full[-]time and permanent custody of his [m]other at this time. It is evident to this court, [sic] that Mother needs long-term therapy to confront and manage her own victimization and to heal.

4. Although [Child] has a positive bond with his [m]other, [the trial court found] that his primary bond is with his foster parents, with whom he has primarily resided for his entire life. Placement with the [L.'s] has also allowed [Child] to develop a relationship with his siblings, which sometimes is equally if not more important than the bond with a parent.

5. [The trial court agreed] that continued contact with Mother would be in [Child's] best interest. There is value in this relationship. However, [the court did not] find that if [Child] were adopted by the [L.'s] and contact with [M]other were to end, that this would be harmful to him given his age and his positive and loving bond with his foster parents and his siblings. Accordingly, [the trial court found] that the need for [Child] to have a safe, loving, and permanent home outweighs his need to maintain a relationship with his [m]other.

- 20 -

Trial Court Opinion Findings of Fact Regarding Contested TPR Hearing, 9/28/18, at 9-10 (emphasis in original).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See T.S.M.*, 71 A.3d at 267 (quoting *K.K.R.-S.*, 958 A.2d at 535). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding.") *See In re: T.S.M.*, 620 Pa. at 629, 71 A.3d at 267 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)). Thus, we will not disturb the trial court's decision. *In re Adoption of S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27.

The evidence supports the trial court's decision to terminate Mother's parental rights to Child pursuant to section 2511(b). Dr. Bliss testified that, although Child had shown a developed bond with Mother when she evaluated them in August of 2018, the bond was beneficial but not necessary. N.T., 9/26/18, at 19, 40. Dr. Bliss described a necessary bond as a bond that would cause undue trauma to Child or life-long problems if the bond were removed or taken away from him. *Id.* at 41-42. Dr. Bliss testified that she did not believe the termination of Mother's parental rights would be traumatic for

Child, although he might exhibit some behaviors that post-adoption services could appropriately address. *Id.* at 25, 26, 41. Dr. Bliss testified that, if Mother's parental rights were terminated, she would recommend that Child's contact with Mother be stopped abruptly, because, based on Child's young age, he would adjust better to the termination. *Id.* at 54-55. Dr. Bliss opined that, the older that Child gets, the more understanding he would develop about the bond he has with Mother, and stopping his contact with Mother would be more detrimental at that stage. *Id.* Dr. Bliss recommended the termination of Mother's parental rights, and she stated that the termination meets Child's needs and welfare, and Foster Parents are an appropriate adoption resource for Child. *Id.* at 22, 24, and 73. Dr. Bliss testified that removing Child from the home of Foster Parents, where he is doing well, would be detrimental to him at any age. *Id.* at 73.

Caseworker Mattey testified that Child has positive interactions with Mother, approaching her when he is sleepy and wants attention. *Id.* at 120. She stated that Mother is loving and attentive, and proud of Child's progress. *Id.* at 120-121. Caseworker Mattey testified that, based on Child's young age, CYF was seeking adoption to ensure that Child's needs and welfare will be met without further Agency involvement. *Id.* at 122-123. CYF was not concerned that the termination of Mother's parental rights would have a detrimental effect on Child. *Id.*

The competent evidence in the record supports the trial court's determination that, although Child is bonded with Mother, he did not have a necessary and beneficial relationship with her, and that he would not be irreparably harmed by the termination of her parental rights. ***In re: T.S.M.***, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013). The competent evidence supports the trial court's concern regarding Child's safety in Mother's care as well. ***In re K.K.R.-S.***, 958 A.2d at 535; ***In re K.Z.S.***, 946 A.2d at 763.

While Mother testified that she loves Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***Z.P.***, 994 A.2d at 1121 (Pa. Super. 2010). We stated in ***In re Z.P.***, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004). ***See also K.Z.S.***, 946 A.2d at 759 ("Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." (citation omitted)). Here, the trial court's concerns that Mother has not created a safe and healthy environment for Child, and cannot meet his special needs on her own, are based on sufficient,

competent evidence of record.    Accordingly, we affirm the trial court's order terminating Mother's parental rights to Child pursuant to section 2511(a)(2) and (b) of the Adoption Act.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/23/2019